UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x

LISA SNEAD,

                      Plaintiff,

       -against-

CITY OF NEW YORK, et al.,

                      Defendants.
------------------------------------------------------------------x

PLAINTIFF'S LOCAL CIVIL RULE 56.1 COUNTERSTATEMENT

16 CV 9528 (AJN)

Pursuant to Rule 56.1 of the Local Civil Rules of this Court, plaintiff submits the following responses to Defendants' Statement of Counter-Facts Pursuant to Local Civil Rule 56.1 dated February 5, 2018 (filed at Docket Entry 71) and Defendants' Statement of Facts Pursuant to Local Civil Rule 56.1 in Support of Defendant's Cross-Motion for Partial Summary Judgment (filed at Docket Entry 76):[1]

<u>RESPONSE TO DEFENDANTS' STATEMENT OF COUNTER-FACTS</u>

1. On the evening of June 24, 2015, New York City Police Department (NYPD) Police Officers Gregory LoBianco and Richard Hanson were assigned to Impact Duty within the 32 Precinct and were patrolling in an unmarked car together with their supervisor, Impact Sergeant Asa Barnes.

Undisputed.

2. As the three Officers were traveling in their vehicle westbound on West 145 Street from Seventh Avenue, one of them noticed a female pedestrian, later identified as plaintiff Lisa Snead, "drinking an open container of alcohol."

---

[1] In filing two Local Civil Rule 56.1 statements (including one filed two days late), defendants have contravened Section 3(G)(viii) of the Court's Individual Practices concerning cross-motions. If it should please the Court, plaintiff responds to both of defendants' submissions herein.

**Disputed.** First, Ms. Snead was not drinking alcohol and the officers never saw her drinking anything. Deposition of Gregory LoBianco, annexed to the Declaration of Gabriel P. Harvis dated March 19, 2018 ("Harvis Decl.") as Exhibit 1 ("LoBianco Dep."), p. 43, ln. 18-21 (Q: [D]id you see her drinking from the can? A: I did not.); Deposition of Richard Hanson, annexed to the Harvis Decl. as Exhibit 2 ("Hanson Dep."), p. 43, ln. 5-8 (Q: …Did you ever see her drinking from the container? A: Did I ever? I never seen her actually sipping out of the container.); Deposition of Sergeant Asa Barnes, annexed to Harvis Decl. as Exhibit 3 ("Barnes Dep."), p. 64, ln. 13-15 (Q: Was Lisa Snead drinking the can when you observed her? A: I recall her holding the can.); Deposition of Lisa Snead, annexed to the Harvis Decl. as Exhibit 4 ("Snead Dep."), p. 52, ln. 10-13 (Q: Ms. Snead, at any time during that day on June 24th, 2015, did you have any type of alcoholic beverage to drink? A: No.); Deposition of Wilhelmina Bryant-Forbes, annexed to the Harvis Decl. as Exhibit 5 ("Bryant-Forbes Dep."), p. 45, ln. 13-14 (Q: Do you know whether [Lisa Snead was holding] an alcoholic beverage? A: I have no idea.).

Second, the officers were traveling <u>eastbound</u> on West 145th Street, the same direction plaintiff and her friend were walking. Barnes Dep., Harvis Decl., Exhibit 3, p. 53, ln. 8-14 (Q: [W]hich direction were you traveling in? A: Eastbound…). The officers thus saw and approached the women from behind (in darkness, *see infra*), making the purported observation impossible as a matter of physics:

> Q: …So she's walking the same direction your car is traveling?
> A: Correct.
> Q: …So you see her from behind?
> A: Yes, to the best of my recollection.
> Q: …How can you tell from behind that she's holding a can of alcohol?
> A: When we pull up next to her, and I don't remember exact particulars whether she is moving, but then turns. I don't remember exactly the particulars.

*Id.* at p. 57, ln. 9-19.

Third, it was late evening and the officers stopped the women in an especially dark area with no street lights, making the disputed alleged observation even less plausible. *See* LoBianco Dep., Harvis Decl., Exhibit 1, p. 38, ln. 6-9. This is how Ms. Snead's companion that evening, also an MTA employee, describes the stop:

Q: And approximately, at what location did you first observe the police officers.

A: When they stopped us in a dark area.

Q: You said, "They."
Was it more than one police officer that stopped you?

A: Police cars put their sirens on in the dark and we was on the sidewalk and they jumped out of the car.

Q: At the time that the police officers put their sirens on, in which direction were you walking?

A: East. East going to her house. Towards the bridge.

Q: Were you going down 145th Street?

A: That's correct.

Q: In which direction were the police officers coming from?

A: The same direction.

Q: …How did you know you were stopped?

A: Because we were the only two walking in the dark area. We left from the light area, a gas station there. We walked from the light spot directly into the dark spot and that's when the sirens came on and they jumped out of the car. I heard a whoop, whoop and they came directly out of the cars.

Q: You said a dark spot.
Where are you saying was a dark spot?

A: Because they were renovating a building next to the gas station (indicating).

Q: Were there any streetlights where you were?

A: Not in the area where they stopped us at.

Bryant-Forbes Dep., Harvis Decl., Exhibit 5, p. 39, ln. 20-p. 41, ln. 13.

Plaintiff respectfully submits that this disputed fact is also not material to plaintiff's motion.[2]

---

[2] In offering this deeply disputed issue as an undisputed fact, defendants violate Local Rule 56.1 "[W]here, as here, the cited materials…do not support the purported undisputed facts in a party's Rule 56.1 statement, those assertions must be disregarded and the court may review the record independently." *Pape v. Bd. of Educ. of Wappingers Cent. Sch. Dist.*, 07 CV 8828 (ER), 2013 WL 3929630, *1 (S.D.N.Y. July 30, 2013) (citing *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 74 (2d Cir.

3.     After all three Officers were made aware that plaintiff was in possession of an open container of alcohol on the sidewalk, Officer LoBianco looked out of his window and observed plaintiff holding in her hand an open can of alcohol "in a brown paper bag with the top portion of the can sticking out of the brown paper bag."

**Disputed.** Ms. Snead did not possess alcohol, and the officers had no reason to believe that she did. *Id.*

It bears noting that defendant LoBianco, who is myopic and bespectacled (*see* LoBianco Dep., Harvis Decl., Exhibit 1, p. 12, ln. 10-19), concedes that the purported observation is fanciful. *Id.* at p. 38, ln. 6-9 (Q: Can you read what's written on the top of a can across four lanes of traffic at night? A: I cannot.). Additionally, the officers did not photograph, secure or voucher the alleged can (*id.* at p. 46, ln. 16-25) and elected not to charge Ms. Snead with an open container violation. Arrest Report, annexed to Harvis Decl. as Exhibit 6; *see* LoBianco Dep., Harvis Decl., Exhibit 1, p. 166, ln. 6 – p. 167, ln. 3:

> Q:    [W]hat happened in that conversation [with Sergeant Barnes at the precinct?]
> A:    I don't recall exactly what happened. I just know that we talked about the charges and how we should handle it.
> Q:    …[W]hat were you told about how the situation would be handled?
> A:    That we should charge her with the charges that we had discussed, the resisting arrest, and the disorderly discon (sic).
> Q:    And what about the open container?
> A:    I don't recall.

Again, this disputed fact is not material to plaintiff's motion.

4.     At least the top half, if not the majority, of the can was sticking out of the paper bag displaying the name of the alcohol on it.

---

2001) and *Costello v. N.Y. State Nurses Ass'n*, 783 F.Supp.2d 656, 661 n.5 (S.D.N.Y. 2011) (disregarding party's Rule 56.1 statement due to failure to refer to evidence in the record)).

**Disputed.** There was no can of alcohol and this observation never happened. *Supra*, at Responses 2-3. This fact is also not material to plaintiff's motion on the fair trial claim.

5.      From his training and experience as an Impact Officer, Officer LoBianco recognized the can as a raspberry-flavored Bud Light alcoholic beverage called "Raz-Ber-Rita."

**Disputed.** Ms. Snead did not possess alcohol and this observation could not have happened. *Id.* Plaintiff respectfully submits that this is also not a material fact.

6.      Sergeant Barnes was also able to observe from his vantage point inside the vehicle that plaintiff was "[d]rinking an open container of alcohol."

**Disputed.** Sergeant Barnes never saw Ms. Snead drinking. Barnes Dep., Harvis Decl. as Exhibit 3, p. 64, ln. 13-15. This fact is also immaterial to plaintiff's motion.

7.      Sergeant Barnes was also able to discern that plaintiff was consuming an alcoholic beverage, a "mixed Bud Light," with the flavor printed on the can and the "Bud Light" symbol on the top of the can.

**Disputed.** According to all three defendant officers, plaintiff was never seen consuming anything. *Supra*, at Response 2. Moreover, the purported observation (reading the label of a can held in a paper bag at night either through a person or across four lanes of roadway) is not possible and did not happen. LoBianco Dep., Harvis Decl., Exhibit 1, p. 38, ln. 6-9. It is also immaterial to plaintiff's motion.

8.      Upon sharing their observations of plaintiff, the Officers immediately drew up their vehicle near plaintiff and exited.

**Disputed.** There were no observations. *Supra*, at Responses 2-3. Plaintiff does not dispute that all of the officers exited their vehicle. This is also not a material fact.

9.      Plaintiff was still holding the open container of alcohol at the time the Officers exited their vehicle and as they approached her.

**Disputed.** *Supra*, at Responses 2-3; plaintiff did not possess alcohol. Snead Dep., Harvis Decl., Exhibit 4, p. 52, ln. 10-13. Plaintiff does not dispute that all three

officers approached her. Plaintiff also respectfully notes that the facts of the encounter as presented by defendants herein are in direct conflict with, and fatal to, the personal involvement arguments they seek to raise in their affirmative motion. *See infra.*

10. Once he exited the police vehicle, Officer Hanson, who had not made any observations of plaintiff from the car, observed the label on the can plaintiff was holding and Officer Hanson, as well, saw that plaintiff was holding an open container of alcohol.

**Disputed.** As indicated *supra*, plaintiff disputes possessing alcohol. Officer Hanson concedes that the alleged can (which he describes as a "can bottle," *see* Hanson Dep., Harvis Decl., Exhibit 2, p. 32, ln. 14-17) may have been empty, and that possession of an empty can (or "can bottle") is legal. *Id.* at p. 49, ln. 5-23. Additionally, Hanson concedes that plaintiff did not have anything in her hand when the officers approached her. *Id.* at p. 58, ln. 11-14 (Q: [W]hen you approached with the other officers, did Lisa Snead still have the alcohol in her hand? No.); p. 58, ln. 25 – p. 59., ln. 4 (Q: Did you see what she did with it? A: I did not see. Q: [W]ho saw? A: I don't know. Possibly Officer LoBianco.)

Plaintiff agrees that Hanson made no observations from the vehicle and that he exited the vehicle and approached plaintiff. Plaintiff respectfully submits that this is not a material fact for the purposes of plaintiff's motion.

11. Upon exiting the vehicle, Officer LoBianco was able to confirm that his recognition of the "Bud Light Raz-Ber-Rita" from the vehicle was correct, and that this was the open alcoholic beverage that plaintiff held in her hand.

**Disputed.** Again, plaintiff disputes possessing alcohol, and her position is supported by, *inter alia,* the implausibility of the alleged observation, the officer's failure to photograph or voucher the can, the contradictions in the officers' testimony (discussed *infra*), the officers' failure to photograph or voucher the alleged can, the fact that the can may have been empty and the fact that the officers did not charge plaintiff with open container. *See* supra at Responses 2-10. This fact is also immaterial.

12. As the Officers moved toward plaintiff, plaintiff approached them, yelling expletives and stating "you don't know who the F—k I am."

**Disputed.** During the encounter, plaintiff was not profane and did not yell. Snead Dep., Harvis Decl., Exhibit 4, p. 147, ln. 16-18 (Q: Did you ever use any profanity

against the officers in general? No.); *id.* at p. 147, ln. 9-11; Bryant-Forbes Dep., Harvis Decl., Exhibit 5, p. 49, ln. 14-p. 51, ln. 18; Hanson Dep., Harvis Decl., Exhibit 2, p. 53, ln. 18-19 (Q: Did [plaintiff] curse? A: I don't recall.); Deposition of D'Andrea Tiffany Pryor, annexed to Harvis Decl. as Exhibit 7, p. 38, ln. 4-12; p. 63, ln. 18-p. 64, ln. 9; p. 68, ln. 9 – 21; p. 35, ln. 17-25:

> Because by then, [the officer] is not being professional with [plaintiff]. He's putting her hands very roughly behind her. She's asking him what's – "what happened?" "What's going on," and I'm saying the same thing like, "Oh my god, why y'all doing that to her? Why you so rough with her? Why you like that with her?"…

*See id.* at p. 78, ln. 19-p. 79, ln. 2:

> Q: Did you ever see [the officer] push [plaintiff] when he was trying to handcuff her?
> A: He was manhandling her. That's what I saw.
> Q: When you say "manhandling," what do you mean by that?
> A: Just being very rough.
> Q: When you say "rough," what do you mean by that?
> A: Grabbing her arm behind her back very roughly, in a rough manner.

Plaintiff respectfully submits that, in any event, this disputed fact is not material to plaintiff's motion.

13. When the Officers attempted to inquire if plaintiff was drinking alcohol and asked to see the open container plaintiff was carrying, plaintiff threw the can to the ground.

**Disputed.** Plaintiff never possessed alcohol, was never observed drinking anything, and did not have a can in her hands when the officers approached her. *Supra,* at Responses 2-3; Hanson Dep., Harvis Decl., Exhibit 2, p. 58, ln. 11-14; Pryor Dep., Harvis Decl., Exhibit 7, p. 67, ln. 23-25 (plaintiff had "nothing in her hands"); *see also* Bryant-Forbes Dep., Harvis Decl., Exhibit 5, p. 46, ln. 2-5. Plaintiff respectfully submits that this is also not a material fact.

14.     When the can of "Bud Light Raz-Ber-Rita" hit the ground, it rolled out of the brown paper bag and was fully exposed.

**Disputed.** Plaintiff did not possess alcohol. *Supra* at Responses 2-3. Notably, even defendant Hanson disputes defendant LoBianco's testimony on this point. *Compare* LoBianco Dep, Harvis Decl., Exhibit 1, p. 64, ln. 9-16 (describing Hanson allegedly walking over and pulling can of alcohol out of paper bag) *with* Hanson Dep., Harvis Decl., Exhibit 2, p. 60, ln. 16 – p. 62, ln. 9 (admitting that Hanson personally had no basis to believe Lisa Snead had violated the law). Plaintiff respectfully submits that this is also not a material fact.

15.     Also when the can of "Bud Light Raz-Ber-Rita" hit the ground, liquid poured out of it, producing an odor of alcohol.

**Disputed.** Plaintiff did not possess alcohol. *Supra* at Responses 2-3. There was no can with liquid pouring out of it, and no odor of alcohol. Barnes Dep., Harvis Decl., Exhibit 3, p. 140, ln. 4-5 (Q: Could you smell alcohol on her breath? A: I Don't recall.); Hanson Dep., Harvis Decl., Exhibit 2, p. 49, ln. 11-16:

>   Q:   Was there liquid coming out of [the can, when it was on the ground]?
>   A:   I only recall it being open. I don't remember how much liquid was in it.
>   Q:   So it could have been totally empty, right?
>   A:   Possibly.

Plaintiff respectfully submits that this is also not a material fact for the purposes of plaintiff's motion on the fair trial claim.

16.     An odor of alcohol emanated from plaintiff as well.

**Disputed.** Plaintiff did not possess alcohol, had not been drinking and had no odor. *See infra*, at Responses 2-3; *see also, e.g.,* Barnes Dep., Harvis Decl., Exhibit 3, p. 140, ln. 4-5. Plaintiff respectfully submits that this disputed fact is not material to plaintiff's motion.

17.     On the following day, June 25, 2015, Police Officer LoBianco signed a criminal complaint against plaintiff swearing that "[plaintiff] possessed with intent to consume an open container containing an alcoholic beverage in a public place, other than a block party, feast and similar function for which a permit had been obtained . . . ." Criminal Complaint, Harvis Decl., Exhibit 2, p.1.

**Disputed.** As discussed in plaintiff's motion for partial summary judgment, defendant LoBianco falsely swore in the criminal complaint that he had "observed" plaintiff "drinking from an open Bud Light." LoBianco admits the sworn statement was false but offered no explanation. LoBianco Dep., Harvis Decl., Exhibit 1, p. 271, ln. 22-25 (Q: Why did you sign something under penalty of perjury saying that you had seen her drinking it when you didn't? A: I'm not sure.). Plaintiff does not dispute that LoBianco signed the false complaint.

18.     At the time the defendant officers stopped plaintiff, non-party Wilhelmina Bryant-Forbes observed plaintiff drinking something from a brown bag which she had in her hand.

**Disputed.** Plaintiff was not drinking alcohol. Snead Dep., Harvis Decl., Exhibit 4, p. 52, ln. 10-13; Hanson Dep., Harvis Decl., Exhibit 2, p. 58, ln. 11-14; Pryor Dep., Harvis Decl., Exhibit 7, p. 67, ln. 23-25. Plaintiff does not dispute that Ms. Bryant-Forbes testified that plaintiff was drinking, but respectfully notes that the witness specifically stated that she had "no idea" if it was alcohol. Plaintiff also respectfully notes that this disputed fact is not material to plaintiff's motion.

## RESPONSE TO DEFENDANTS' STATEMENT OF FACTS

1.      On the evening of June 24, 2015, at approximately 9:58 p.m., plaintiff Lisa Snead was arrested on West 145 Street, New York, New York, on charges including resisting arrest, and several counts of disorderly conduct.

**Undisputed.** As noted above, the officers did not charge plaintiff with violating Section 10-125 of the NYC Administrative Code an open container. *See Arrest Report*, Harvis Decl., Exhibit 6.

2.      Plaintiff's arresting officer Officer Gregory LoBianco (sic).

**Undisputed**, if this fact is interpreted to read: "Plaintiff's arresting officer *was* Officer Gregory LoBianco." Indeed, defendant LoBianco was administratively assigned as the processing officer for plaintiff's arrest. *See* Arrest Report, Harvis Decl., Exhibit 6.

However, as demonstrated below, all three defendants directly participated in the encounter and seizure of plaintiff, including handcuffing her, and plaintiff's arrest was

ordered and authorized by defendant Barnes. *See, e.g.,* Hanson Dep., Harvis Decl., Exhibit 2, p. 37, ln. 5-12 (Q: What happened when the car came to a stop? A: We exited the vehicle. Q: All three of you? A: Yes…); Barnes Dep., Harvis Decl., Exhibit 3, p. 72, ln. 23- p. 73, ln. 5 (Q: What happened? A: We approached her. Q: [A]ll three of you? A: Yes.); Bryant-Forbes Dep., Harvis Decl., Exhibit 5, p. 52, ln. 16-18 (Q: How many officers placed her into the vehicle? A: Well it was three surrounding her…); Hanson Dep., Harvis Decl., Exhibit 2, p. 101, ln. 20-p. 102, ln. 7 (Q: What happened next? A: I remember coming over and helping officer LoBianco get both of [plaintiff's] hands behind her back. Q: [W]here was Barnes? A: He was with us, as well. Q: [S]o the three of you were all involved in the physical act of apprehending her?...A: …We all helped get her hands behind her back to place her into custody.); *id.* at p. 77, ln. 3-7 (Q: …So within a minute or two of the car pulling up at the curb, Barnes had told you and LoBianco that Snead was going to go back to the precinct? A: Yeah I believe it was a minute or two…); p. 99, ln. 10-14.

Notably, by plaintiff's account, defendants LoBianco and Hanson were each present with Ms. Snead during the hours-long period when the officers chained Ms. Snead to a wall and prohibited her from using the bathroom, causing her to micturate on herself, a profound indignity. *See, e.g.,* Snead Dep., Harvis Decl., Exhibit 4, p. 70, ln. 13-22 (describing the officers' laughter at the puddle of urine at Ms. Snead's feet).

3. At the time of plaintiff's arrest, Officer LoBianco was assigned to Impact Duty within the confines of the 32 Precinct, patrolling in an unmarked car with Officer Richard Hanson and their supervisor, Sergeant Asa Barnes.

**Undisputed**. However, plaintiff respectfully submits that this is not a material fact.

4. Officer LoBianco was the only officer who approached plaintiff at the time of her arrest.

**Disputed.** All three defendant officers approached and ultimately surrounded and forcibly handcuffed Ms. Snead. Hanson Dep., Harvis Decl., Exhibit 2, p. 37, ln. 5-12; p. 38, ln. 14-22; p. 39, ln. 24-p.40, ln. 3; Barnes Decl., Harvis Decl., Exhibit 3, p. 64, ln. 18-20 ("[W]e approached her…"); p. 65, ln. 17-19 (same); p. 72, ln. 23-p. 73, ln. 3 (same); p. 74, ln. 17-18 (Q: Do you remember walking up to Lisa Snead? A: Yes.); Snead Dep., Harvis Decl., Exhibit 4, p. 23, ln. 1-6; p. 33, ln. 21-p. 34, ln. 2 (Q:…[D]id you see any other officers aside from the one that was questioning you? A:

Yes. At that time. Q: How many officers did you see? A: Two. Q: Two other officers? A: Yes.).

5. Officer LoBianco was the only officer who asked plaintiff questions at the time of her arrest.

**Disputed**. On this record, it is unclear who spoke to Lisa Snead. *See, e.g.,* Barnes Dep., Harvis Decl., Exhibit 3, p. 76, ln. 15-17 (Q: Did you have any conversation with Lisa Snead personally? A: I don't recall.); LoBianco Dep., Harvis Decl., Exhibit 1, p. 111, ln. 21-24. However, plaintiff respectfully submits that this is not a material fact and that there is ample evidence that each of the defendants was personally involved. *See supra.*

6. Plaintiff did not see any other officer around while Officer LoBianco was asking her questions.

**Disputed**. Plaintiff saw three officers. Snead Dep., Harvis Decl., Exhibit 4, p. 23, ln. 1-6; p. 33, ln. 21-p. 34, ln. 2 (Q:…[D]id you see any other officers aside from the one that was questioning you? A: Yes. At that time. Q: How many officers did you see? A: Two. Q: Two other officers? A: Yes.). In any event, the question is not what plaintiff saw in the darkness of the encounter, but rather what the record suggests actually happened, and what the defendants themselves admit. *See supra.*

7. Officer LoBianco was the only officer who placed plaintiff in handcuffs.

**Disputed**. All three defendant officers participated in handcuffing Ms. Snead. Hanson Dep., Harvis Decl., Exhibit 2, p. 101, ln. 20-p. 102, ln. 7 (Q: What happened next? A: I remember coming over and helping officer LoBianco get both of [plaintiff's] hands behind her back. Q: [W]here was Barnes? A: He was with us, as well. Q: [S]o the three of you were all involved in the physical act of apprehending her?...A: …We all helped get her hands behind her back to place her into custody.); Barnes Dep., Harvis Decl., Exhibit 3, p. 104, ln. 10-14 (Q: And how did you do that? A: …[W]e put her in cuffs and transported her back to the 32nd Precinct.); LoBianco Dep., Harvis Decl., Exhibit 1, p. 107, ln. 23 – p. 108, ln. 2 (Q: [W]ere you the only person that was handcuffing her at that time? A: …I believe Officer Hanson was also involved.); p. 123, ln. 19-p. 124, ln. 16 (Q: …[W]here was Officer Hanson [when you were handcuffing plaintiff]? A: I believe he was right next to me.); Bryant-Forbes

Dep., Harvis Decl., Exhibit 5, p. 52, ln. 16-18 (Q: How many officers placed her into the vehicle? A: Well it was three surrounding her…).

8. Plaintiff also testified that after Officer LoBianco handcuffed plaintiff, he walked her to the police vehicle and placed her in the back seat.

Disputed. All three officers handcuffed plaintiff, *see id.* Additionally, plaintiff was "shoved" into the police car, not "placed." *See*, e.g., Pryor Dep., Harvis Decl., Exhibit 7, p. 69, ln. 1-6 ("Q: …After he was able to handcuff her, what did he do? A: Walked her to the car and shoved her in. Q: …How did he do it? A: Forcibly got her in the police car to where she almost hit her head."). It is unclear whether defendant LoBianco shoved plaintiff into the car, or whether it was a joint effort between him and defendant Hanson. *See* LoBianco Dep., Harvis Decl., Exhibit 1, p. 140, ln. 20-25 (Q: …[W]ho put her in the car? A: I don't recall exactly who. I believe that me an[d] Officer Hanson [did it]. I don't know exactly which one. I believe it was a joint effort and I don't believe one set person did it.); p. 144, ln. 24 - p. 145, ln. 3 ("…[M]e and Officer Hanson placed her on the passenger back seat…").

9. Once she arrived at the police vehicle, plaintiff escorted by Officer LoBianco, observed for the first time an officer other than LoBianco.

Disputed. This is unintelligible. In any event, as plaintiff was being shoved into the police car (by LoBianco at the instruction of Barnes), defendant Hanson told plaintiff "you should be more worried about losing weight" than about the officers' courtesy, professionalism and respect. Snead Dep., Harvis Decl., Exhibit 4, p. 41, ln. 14-18.

10. Plaintiff observed the second officer step out of the police vehicle and open the door in order for Officer LoBianco to place plaintiff inside.

Disputed. *See id.* Defendant Hanson did more than open the door.

11. Prior to observing the second officer exit the police vehicle in order to open the door for plaintiff's entry, plaintiff had not seen the second officer at any time during her prior interactions with Officer LoBianco, and she had not seen the second officer exit the vehicle.

Disputed. Whether or not plaintiff had "seen the second officer exit the vehicle" is not a material fact and the officers admit to exiting. *See* Hanson Dep., Harvis Decl.,

Exhibit 2, p. 37, ln. 5-12 (Q: What happened when the car came to a stop? A: We exited the vehicle. Q: All three of you? A: Yes…)

12.    A total of two officers got into the police vehicle with plaintiff and transported her to the 32 Precinct.

**Disputed**. All three defendant officers were in the police car when plaintiff was driven to the 32nd Precinct in handcuffs. Snead Dep., Harvis Decl., Exhibit 4, p. 50, ln. 1-9 ("There was an officer sitting next to me [in the police car], and there could have been two in the front."); Barnes Dep., Harvis Decl., Exhibit 3, p. 104, ln. 10-14 (Q: And how did you do that? A: …[W]e put her in cuffs and transported her back to the 32nd Precinct.); Hanson Dep., Harvis Decl., Exhibit 2, p. 90, ln. 15-25. In point of fact, defendants Barnes and Hanson initially drove off with plaintiff in the backseat of their car; LoBianco was left standing in the street. The officers ultimately stopped the vehicle and allowed LoBianco to enter. Pryor Dep., Harvis Decl., Exhibit 7, p. 74, ln. 16-p. 75, ln. 10.

13.    A total of two police officers were present at the time of plaintiff's arrest.

**Disputed**. All three defendant officers were present for and involved in plaintiff's arrest. Hanson Dep., Harvis Decl., Exhibit 2, p. 37, ln. 5-12 (Q: What happened when the car came to a stop? A: We exited the vehicle. Q: All three of you? A: Yes…); Barnes Dep., Harvis Decl., Exhibit 3, p. 72, ln. 23- p. 73, ln. 5 (Q: What happened? A: We approached her. Q: [A]ll three of you? A: Yes.); Bryant-Forbes Dep., Harvis Decl., Exhibit 5, p. 52, ln. 16-18 (Q: How many officers placed her into the vehicle? A: Well it was three surrounding her…); Hanson Dep., Harvis Decl., Exhibit 2, p. 101, ln. 20-p. 102, ln. 7 (Q: What happened next? A: I remember coming over and helping officer LoBianco get both of [plaintiff's] hands behind her back. Q: [W]here was Barnes? A: He was with us, as well. Q: [S]o the three of you were all involved in the physical act of apprehending her?...A: …We all helped get her hands behind her back to place her into custody.); *id.* at p. 77, ln. 3-7 (Q: …So within a minute or two of the car pulling up at the curb, Barnes had told you and LoBianco that Snead was going to go back to the precinct? A: Yeah I believe it was a minute or two…); p. 99, ln. 10-14.

14.    Apart from the officer who placed plaintiff in handcuffs, no other officer made any physical contact with plaintiff pursuant to her arrest.

-13-

**Disputed.** All three defendant officers made physical contact with plaintiff. Hanson Dep., Harvis Decl., Exhibit 2, p. 101, ln. 20-p. 102, ln. 7 (Q: What happened next? A: I remember coming over and helping officer LoBianco get both of [plaintiff's] hands behind her back. Q: [W]here was Barnes? A: He was with us, as well. Q: [S]o the three of you were all involved in the physical act of apprehending her?...A: …We all helped get her hands behind her back to place her into custody.); Barnes Dep., Harvis Decl., Exhibit 3, p. 104, ln. 10-14 (Q: And how did you do that? A: …[W]e put her in cuffs and transported her back to the 32nd Precinct.); LoBianco Dep., Harvis Decl., Exhibit 1, p. 107, ln. 23 – p. 108, ln. 2 (Q: [W]ere you the only person that was handcuffing her at that time? A: …I believe Officer Hanson was also involved.); Pryor Dep., Harvis Decl., Exhibit 7, p. 69, ln. 1-6 ("Q: …After he was able to handcuff her, what did he do? A: Walked her to the car and shoved her in. Q: …How did he do it? A: Forcibly got her in the police car to where she almost hit her head.); LoBianco Dep., Harvis Decl., Exhibit 1, p. 140, ln. 20-25 (Q: …[W]ho put her in the car? A: I don't recall exactly who. I believe that me an[d] Officer Hanson [did it]. I don't know exactly which one. I believe it was a joint effort and I don't believe one set person did it.); p. 144, ln. 24 – p. 145, ln. 3("…[M]e and Officer Hanson placed her on the passenger back seat…").

15. No officer searched plaintiff either at the scene of her arrest or at the 32 Precinct before she was placed in her cell.

**Disputed**. Plaintiff was searched at least once. Hanson Dep., Harvis Decl., Exhibit 2, p. 131, ln. 14-16 (Q: Was Lisa Snead searched at the desk? A: I believe so, yes…); LoBianco Dep., Harvis Decl., Exhibit 1, p. 141, ln. 23 - p. 142, ln. 4 (plaintiff "was being searched by one of the officers…"); p. 142, ln. 13-23 (Q: Who [searched plaintiff]? A: I'm not sure exactly who searched her…it was a female officer…); p. 153, ln. 22-24 (Q: Where was Lisa Snead's driver's license? A: …It was on her person. The searching officer had found it.); p. 157, ln. 14-17 (Q:…What happened at the desk? A: I had proceeded to fill out the prisoner pedigree form and [plaintiff] had been searched by a female officer); *see also id.* at p. 181, ln. 25-p. 182, ln. 5.

16. Officer LoBianco completed plaintiff's arrest paperwork and transmitted it to the prosecutor's office the night of plaintiff's arrest.

**Disputed**. LoBianco and Barnes first had a conversation about "how the situation would be handled." LoBianco Dep., Harvis Decl., Exhibit 1, p. 166, ln. 6 – p. 167, ln. 3. Defendant Barnes explained to LoBianco that Ms. Snead would be charged with

-14-

disorderly conduct (Ms. Snead was ultimately charged with four subsections of that violation, *see* Arrest Report, Harvis Decl., Exhibit 6) and resisting arrest. *Id.* Notably, the defendants elected not to charge Ms. Snead with any crime related to the alleged open container, and inaccurately stated in the arrest report that no force was used. *Id.; Compare* Arrest Report, Harvis Decl., Exhibit 6 at p. 3 ("Force Used: NO") *with* LoBianco Dep., Harvis Decl., Exhibit 1, p. 126, ln. 22-p. 127, ln. 3 (admitting to the use of force in the handcuffing of plaintiff). Plaintiff does not dispute that LoBianco prepared paperwork related to plaintiff's arrest and forwarded it to prosecutors.

17. The morning following plaintiff's arrest, Officer LoBianco spoke with the prosecutor regarding the facts of plaintiff's arrest.

**Undisputed.**

18. Officer LoBianco told the prosecutor the facts of plaintiff's arrest, the prosecutor then wrote up plaintiff's Criminal Complaint and faxed it to Officer LoBianco for his signature.

**Disputed**. Plaintiff broadly disputes all material aspects of the officers' account, and LoBianco admits that portions of his account are fabricated. *See supra*, *generally*; *see also* Plaintiff's Motion for Partial Summary Judgment dated January 22, 2018.

19. Sergeant Barnes does not recall ever speaking to the prosecutor regarding plaintiff's case.

**Undisputed.** However, plaintiff respectfully submits that this is not a material fact.

20. Officer Hanson does not recall ever talking to the prosecutor regarding plaintiff's case.

**Undisputed.** However, plaintiff respectfully submits that this is not a material fact.

STATEMENT OF ADDITIONAL MATERIAL FACTS

1. **Plaintiff Lisa Snead has worked as a bus operator for New York City Transit for fifteen years.** Snead Dep., Harvis Decl., Exhibit 4, p. 104, ln. 19-23.

2.   Prior to the events of June 24, 2015, plaintiff had never been arrested. *Id.* at p. 113, ln. 1-3.

3.   On the evening of June 24, 2015, Ms. Snead and co-worker Wilhelmina Bryant-Forbes were walking east down 145th Street in Harlem on the way to plaintiff's apartment. *Id.* at p. 22, ln. 22-25; p. 24, ln. 1-4.

4.   Neither of the women were drinking alcohol. *Id.* at p. 52, 10-13; p. 148, ln. 2-4; Bryant-Forbes Dep., Harvis Decl., Exhibit 5, p. 58, ln. 11-14; p. 45, ln. 10-14.

5.   One of the women was pushing a shopping cart; the cart contained a small flat screen television in a bag. Snead Dep., Harvis Decl., Exhibit 4, p. 19, ln. 23-p. 20, ln. 5; p. 21, ln. 7-10.

6.   On a particularly dark stretch of 145th street, between Adam Clayton Powell Junior Boulevard and Frederick Douglass Boulevard, police officers jumped out of their car and approached Ms. Snead. *Id.* at p. 23, ln. 1-6; Bryant-Forbes Dep., Harvis Decl., Exhibit 5, p. 39, ln. 20-p. 41, ln. 13.

7.   An officer, believed to be defendant LoBianco, demanded information from Ms. Snead about the contents of "the bag." Snead Dep., Harvis Decl., Exhibit 4, p. 28, ln. 3-4; p. 25, ln. 22-25.

8.   Believing the officer to be referring to the bag containing the television, Ms. Snead responded by asking the officer if something had happened. *Id.* at p. 27, ln. 22-24; p. 28, ln. 15-17.

9.   The officer told Ms. Snead, in sum and substance, that he would be doing all the questioning and that she had no right to ask questions. *Id.* at p. 27, ln. 25-p. 28, ln. 2; p. 28, ln. 22-24.

10.  The officer became irate and told plaintiff, in sum and substance "I see you got questions – ask your questions when I take you to the 32nd Precinct. Put your hands behind your back…" *Id.* at p. 29, ln. 24-p. 30, ln. 2.

11.  Ms. Snead complied. *Id.* at p. 36, ln. 7-9; *see also* Bryant-Forbes Dep., Harvis Decl., Exhibit 5, p. 46, ln. 6-10.

12.  Ms. Snead immediately complained that the handcuffs were too tight and painful. Snead Dep., Harvis Decl., Exhibit 4, p. 130, ln. 7-9; Bryant-Forbes Dep., Harvis Decl., Exhibit 5, p. 46, ln. 11-15.

13. Defendants Hanson and LoBianco shoved Ms. Snead into a police vehicle. Pryor Dep., Harvis Decl., Exhibit 7, p. 69, ln. 1-6.

14. When Ms. Snead questioned the officers' professionalism, defendant Hanson responded that plaintiff should be "more worried about losing weight." Snead Dep., Harvis Decl., Exhibit 4, p. 41, ln. 7-16.

15. At the 32nd Precinct, Ms. Snead was confined to a cell until she asked to use the restroom. Snead Dep., Harvis Decl., Exhibit 4, p. 57, ln. 2-6; p. 58, ln. 11-14; p. 59, ln. 25 – p. 60, ln. 9; p. 62, ln. 14-16.

16. At that point, an officer believed to be LoBianco took Ms. Snead out of the cell and handcuffed her to a post on the wall. No seat was provided and Ms. Snead was made to stand. Snead Dep., Harvis Decl., Exhibit 4, p. 59, ln. 17-20; p. 62, ln. 14-16; p. 68, ln. 14-16.

17. Despite repeated requests of increasing urgency, officers Hanson, LoBianco and unidentified 32nd Precinct personnel refused to allow Ms. Snead to use the restroom, causing her to urinate on herself. Snead Dep., Harvis Decl., Exhibit 4, p. 68, ln. 3-6.

18. The officers laughed as a puddle of urine gathered at Ms. Snead's feet. Snead Dep., Harvis Decl., Exhibit 4, p. 70, ln. 13-22.

19. Ms. Snead was ultimately chained to the post standing for approximately five hours, including approximately two hours after she had urinated on herself. Snead Dep., Harvis Decl., Exhibit 4, p. 82, ln. 22-24.

20. Without being permitted to clean or use the restroom at all, Ms. Snead was then transported to central booking in her soiled clothes chained to male prisoners. Snead Dep., Harvis Decl., Exhibit 4, p. 82, ln. 20-21.

21. At central booking, Ms. Snead was finally given the opportunity to clean herself and throw out her soiled undergarments. Snead Dep., Harvis Decl., Exhibit 4, p. 125, ln. 11-18.

22. Ms. Snead was forced to return to Court, missing work, approximately nine times over the next fifteen months, before all charges were dismissed. Snead Dep., Harvis Decl., Exhibit 4, p. 103, ln. 24 – p. 104, ln. 9.

23.     The humiliating experience caused Ms. Snead profound emotional distress and other lasting damages. Snead Dep., Harvis Decl., Exhibit 4, p. 131, ln. 13 – p. 133, ln. 12.

24.     There is a police precinct on Ms. Snead's route as a bus driver and NYPD officers regularly ride her bus. For Ms. Snead, these interactions now provoke a sense of recurring anxiety. Snead Dep., Harvis Decl., Exhibit 4, p. 134, ln. 2 – p. 135, ln. 8.

Dated:  New York, New York
        March 19, 2018

                                        HARVIS & FETT LLP

                                        _____
                                        Gabriel P. Harvis
                                        305 Broadway, 14th Floor
                                        New York, New York 10007
                                        (212) 323-6880
                                        gharvis@civilrights.nyc

                                        *Attorneys for plaintiff Lisa Snead*